## THE STATE v. JOHN ENGLE.

1. If a statute uses a word, as the word "heir," which has a definite meaning at common law, it will be received in that sense unless it clearly appears that a different sense was intended.

2. The word lien, in the act of March 15 1837, relative to lands of John G. Leake, and in the decision of the commissioners named in it, must be taken

The State v. Engle.

in its technical sense, as the person who would inherit by the law of this state.

3. The release directed by that act, passed no estate or title, but only *removed the hands*, gave up the possession, and abandoned the claim, of the State.

4. After the State in proceedings in escheat have acknowledged a certain person as heir at law, have given up possession and released their right unto him as heir; the court will not permit such heir to proceed with the escheat in the name of the State for his own benefit.

5. The copy of a record of a deed from the Register's office in another State, duly certified according to the act of Congress, is not evidence in this state of title to lands here. (Per NEVIUS, J.)

6. A verdict will not be set aside because illegal testimony has been admitted, if it appears clearly to the court that the verdict is right irrespective of such illegal evidence.

On traverse of inquisition. An alias writ of escheat was directed to Jacob C. Terhune, Sheriff of the county of Bergen, to inquire whether John G. Leake did not die seised of other lands than those described in the inquisition taken before Garret Van Dien, late Sheriff, &c. and whether he did not die without heirs, or devising the same. An inquisition was thereupon returned, taken before the said Sheriff of Bergen, dated July 12, 1838, in which it was found that Leake died seised of a seventeen acre lot therein described, besides the lands described in the first inquisition, and without heirs and without devising the same.

To this inquisition a traverse was filed in Chancery by John Engle, the tenant in whose occupation the 17 acre lot was, denying that John G. Leake died seised of the seventeen acre lot, or that he died without heirs; and alleging that he left James Thomson, his heir at law. On both branches of this traverse the state took issue, and the Chancellor sent the issue to the Supreme Court for trial.

The Supreme Court, on application of James Thomson for leave to take down this issue to be tried in the name of the State, directed by rule at January Term 1846 that the same be sent down to the Hudson Circuit for trial, under certain directions in said rule contained, one of which was, " that upon the

The State v. Engle.

trial of such issue, all such evidence be admitted on the part of the defendant as would be legal and proper in an action of trespass and ejectment for the said land prosecuted on the demise of the said James Thomson, against the said defendant, and on the part of the State, evidence to rebut the same."

The cause came to be tried before the CHIEF JUSTICE, at the Hudson Circuit on the third Tuesday in February, 1846.

On the part of the State, witnesses were examined to shew that John G. Leake had, from 1795 to his death, June 7, 1827, exercised from time to time acts of ownership over the 17 acre lot, and the deposition of Sylvanus Miller was offered to shew that Leake died without heirs.

Also, the following documentary evidence was offered on the part of the state:

Petition of John Engle, administrator of John G. Leake, to Bergen Orphans' Court for sale of lands.

Copy of John Engle's oath on administration bond.

Copy of letters of administration to him.

John Engle's petition to Legislature, dated Feb. 6, 1830.

Petition of John Engle and J. M. Cornelison, dated January 2, 1837.

The acts of Feb. 1, 1829; of Feb. 24, 1830; and of Feb. 27, 1834.

The State having rested, on the part of John Engle the following documentary evidence was offered:

The Act of March 10, 1836, (*Pam. Laws* 385).

The Act of March 15, 1837, ( "       "     452).

Henry Hilliard's commission under the great seal of New Jersey.

A certified and examined copy of decision of special commissioners under Act of 1837, dated Dec. 25, A. D. 1837, of which the following are extracts:

"We do on this 25th day of December, A. D. 1837, find, declare, adjudge, decree and determine, that James Thomson, of Barony, parish of Glasgow, county of Lanark, North Britain, is lawful heir and next of kin to John G. Leake, late of the city of New York, deceased," and—"We the said commissioners

do hereby adjudge and decree that the said James Thomson as such lawful heir, and next of kin of the said John G. Leake, deceased, is entitled to all the estate of the said John G. Leake, deceased, in the state of New Jersey."

A certified copy of writ of *hab. fac. poss.* on said decision issued out of Supreme Court.

A certified copy of the enrollment of proceedings in Chancery, between James Thomson, complainant, and John Engle, defendant.

The deposition of Josiah Johnson in said cause in Chancery.

A certified copy of the inquisition before Garret Van Dien.

Evidence of the contents of a deed given by John Moore White, Attorney General of New Jersey, to James Thomson, dated Feb. 23, 1838, and of a deed given by R. S. Field, Attorney general, to James Thomson, dated Nov. 22, 1838.

Examined copy of resolutions of Assembly of Feb. 22, 1838, and the preamble thereto. (*Printed Journal*, p. 547.)

The map referred to in deposition of Josiah Johnson.

The Bergen Field books allotting No. 218 (the 17 acre lot) to the heirs of Sir Peter Warren, and the farm to heirs of R. Leake.

The counsel for the State offered in evidence as rebutting—

A certified copy from the records of the Register's office of the city of New York of a power of attorney from Lord Gage and others to Peter Kemble and John Watts, dated January 26 1791, which was objected to by the traverser and admitted by the court. The State then offered the deposition of William Kemble, which was objected to by the traverser and admitted by the court. The State then read in evidence the depositions of Jeremiah Youmans, Jacob Garrabrants, Senr. Henry Youmans, Senr. and James Dods, in the Chancery suit, also, John Engle's answer, of which the following is an extract:

"And the defendant denies that said James Thomson, the complainant in this case, is heir at law to said John G. Leake, and insists that said James Thomson was at death of John G. Leake, an alien and subject of the King of Great Britain, and still so continues, and is not, nor ever has been a citizen of this state, or of the United States, nor capable of inheriting lands in

this state, and that said complainant never had any right or title to said lands, except by his pretended release from the Attorney General of this state."

The defendant offered an examined copy of the assent of James Thomson to the act of March 15, 1837.

The counsel of Engle called upon the court to charge the jury that the word " heir " in the Act of March 15, 1837, and in the decision of the commissioners, meant an heir capable of inheriting by the law of New Jersey; and that the decision of the commissioners that James Thomson was heir at law of John G. Leake, was evidence of that fact; and that by the words of the Act of 1837, it was conclusive on the State in this issue.

.The court declined so to charge, but charged that the intention of the Legislature, in the Act of 1837, was to allow claimants who were aliens, to assert their claims before the commissioners, and that a person who would have been " an heir " of Leake by any law, as by the law of Scotland, might be well held by the commissioners to . be his heir at law under the provisions of that act.

The jury under the charge of the court found a verdict for the State, and at the Term of April 1846, a rule to shew cause for a new trial was granted.

Before the CHIEF JUSTICE, and NEVIUS and CARPENTER, JJ.

Mr. *Zabriskie*, for rule.

1. The Judge erred in admitting in evidence the certified copy of the letter of attorney from the Register's office in the city of New York; letter of attorney given by Lord Gage and wife and others, to Peter Kemble and John Watts, dated 26th January, 1791.

The issue joined in the Court of Chancery is nominally between the State and Engle, but the name of the State is used for the benefit of James Thomson. The Attorney General has disclaimed any interest on the part of the State, and the Supreme Court has permitted Thomson to take the issue down upon terms—terms imposed upon him, not *at our request*, for we de-

nied his right *in toto* to use the name of the State, but on his own motion. The court ordered that evidence should be admitted on the part of defendant as if ejectment by Thomson against defendant. It was a mistake in counsel and in the court at trial to treat this as an ejectment; or to suppose that the court by the condition in the rule, intended to change the issue. In granting *the favor* asked, permission to proceed in the name of the State against Engle, they annexed as a condition, what would have been the rule of evidence had he proceeded in his own name. Its effect was to make the decree and the depositions of deceased witnesses in chancery suit evidence here. The claim of Thomson to take this issue down to trial was in itself an absurdity; it was founded on a release from the state, which recites that he was the heir of John G. Leake, and yet he asked the jury to say that Leake died without heirs.

Evidence was offered on the part of the state of acts of ownership by Leake. To rebut this we offered the field books of the commissioners, who divided the common lands of the township of Bergen, by which *the farm* appears to have been allotted to the heirs of the father of John G. Leake, but lot *No.* 218, the lot in question, to the heirs of Sir Peter Warren. We offered this to shew that the lot was no part of *the farm* owned by Leake. We also proved by deposition of Josiah Johnson, a surveyor, and then employed by Leake, that Leake had admitted to him a few years before his death, that this lot was no part of his farm, but was *Watts'* lot.

The objection arises on evidence offered by the State, to avoid the effect of this evidence, and to deduce the title from Sir Peter Warren to John G. Leake. The document is certified according to the act of Congress. It was a general power of attorney, which recited pedigree of Susannah Skinner; as a recital it was *irrelevant*, not being connected with Leake's title, but its only effect was to let in next evidence, to wit: the books of Peter Kemble, proved by his son William Kemble. They shew that Peter Kemble had charged himself with so much money received of John G. Leake, for one third of lot No. 218, and had paid $5 for drawing deed for same. The evidence of pedigree was immaterial, unless they could connect the title of Leake with

the title of Lady Susannah Gage.    This letter was relevant therefor, as one step in the chain of title.    But can title to lands in New Jersey be proved by exemplifications of office copies from New York ?    Did the act of Congress mean to go further than to make evidence in another state that which might be evidence in the state itself?    There is no authority in New York to record documents relating to title in another state, and therefor not evidence in that state ; if so, they cannot be made evidence by being certified into the state in which the title exists, the words of the act of Congress preclude that.

It is a well settled rule of law that the *lex loci* governs transactions in regard to lands, and the provision in the constitution must be understood in connection with this rule.    Because the letter relates to several lots in New York, and therefore evidence there as to them, it is not thereby made evidence in New Jersey as to the other lot.    *Elm. Dig.* 79 § 1 ; 1 *Rev. Stat. of N. Y.* 761 § 27.

It was not the intention of the act of Congress to give to one state regulation of the conveyance of lands in another state, or of what should be deemed conclusive or even *prima facie* evidence of such conveyance.

It might well be questioned if Sect. 1. of Art. 4 of the Constitution of the U. S., was intended to apply except to " the *public* acts, judicial proceedings, and records of *a State*"— meaning by the " records *of* a State," the official records of proceedings of the Legislature, municipal, executive and judicial State authorities.    And whether the *quasi* records authorized to be made *in* a State of *private transactions* between its citizens, as of bonds, deeds, &c., by copying them in a book, can fairly be included under that clause of the constitution.    If they can, then if the Legislature of Arkansas enact that a bond acknowledged or proved before a justice of the peace, and recorded by the town clerk, or the town clerk's certificate of it, shall be conclusive evidence *there* of the genuineness and validity of the bond, a New York merchant, never within the jurisdiction of Arkansas, may be sued in his own city, on a bond given, or pretended to have been given, *there*, and may be confronted at the trial by the certified copy of the town clerk, and without having

an opportunity to inspect his bond, may be cut off by the Arkansas Statute, and the *effect* given to such exemplification by the act of Congress, from all defence of forgery, usury, or fraud, given him by the law of New York, it being in this case both *lex fori* and *lex loci contractus.* The act of Congress of 1804, clearly leads to these consequences. But will the clause of the Federal Constitution, on which the force of that act depends, bear that construction? If not, that act is clearly unconstitutional and void, and this evidence illegal.

2. There was error in admitting the deposition of William Kemble, and the objection is to the substance of the deposition, not to its form or to the competency of the witness. The books of Peter Kemble, proved by the deposition, were not competent evidence of title to land. Not good secondary evidence of deed lost..

3. There was error in the charge of the judge in regard to the meaning of the words "lawful heir" and "heir" in the act of 15th March, 1837, (*Pam. L.* 452); and in not charging as requested that the decision of the commissioners, that James Thomson was lawful heir, and the recitals in the deeds given by the state to Thomson, were evidence that Thomson was heir according to the law of New Jersey. Thomson made himself a party to the act by coming in under the name of the State.

Technical words in statute, unless a different meaning clearly appears, are to have their legal signification. *Dwarris* 697, 702; 1 *Kent* 462, 468.

The heir is *the person upon whom the law casts the inheritance,* according to the law under which the question may arise. As the law was at the time of the death of Leake, an alien could not be heir. There is nothing to show that the legislature meant to dispense with legitimacy, citizenship, or any thing comprehended under the term heir. Who is heir of land must depend upon the law of land in which country is situated. *Doe* v. *Vardill,* 5 *B. & C.* 438; 9 *Bligh* 32, 83; 6 *Bing. N. C.* 385, *S. C.*

For construction of private acts, *Broom's Max.* 257, 260, (*Law Lib.*); *Chit. Prerog.* 391.

The commissioners under the act had the right to decide who

was the heir of Leake. If conclusive on the State, then on Thomson. The deeds to Thomson recite him to be heir; so the minutes of Assembly, 1837.

And if State not subject by *common law* to estoppel, it may by statute alter that law, and enact that *all judgments*, or as in this case, a particular decision shall bind the state.

*W. Halsted,* contra.

The traverse filed by Engle, the tenant of the land, described in the inquisition, denies that Leake *died seized,* &c., and that he died without heirs *capable of inheriting,* &c. It applies not to the time of the trial, but to the time of his death.

1. As to the decision of the commissioners, and its effect. The escheat act was called for and passed in consequence of the death of Leake, which occurred in 1827. *Act 27th Feb.* 1828, *Elmer's Dig.; Rev. Stat.* 342. The issue was set down under the provisions of this statute, and it is very doubtful if this court has the authority to grant new trial. But the court had no power to change the issue, and impose the conditions contained in their rule of January, 1846. Under this rule the deposition of Josiah Johnson was admitted in evidence, taken in a cause to which the state was not a party, and from the admission of this deposition the difficulty has arisen. The Legislature never intended by the Act of 15th March, 1837 (*Pamph.* 452) to erect a special commission for the use of their own citizens; nor did they contemplate a legal heir capable of inheriting lands in this state, when they had legislated for years on the ground that there was no such heir. See Acts of 21st Feb. 1829 (*Pamph.* 81); 24th Feb. 1830 (*Pamph.* 109); 27th Feb. 1834 (*Ib.* 166); 10th Nov. 1835 (*Ib.* 21); 10th March, 1836 (*P.* 385) &c. These acts had been procured upon the ground that the heirs, so called, were aliens, and finally by the Act of 1837, a special commission was enacted to adjudicate upon the equitable rights of those who claimed to be the next of kin, or heirs in that sense, of John G. Leake. The decision of the commissioners shews that James Thomson, whom they declared to be the lawful heir and next of kin of Leake, was a foreigner. The doctrine of estoppel does

.not apply to the state. 10 *Vin.* 478; *Johnson* v. *U. S.,* 5 *Mason* 425.

If misdirection, still, if justice done, court will not set verdict aside. *Princeton Turnpike Co.* v. *Gulick,* 1 *Har. R.* 161; *Snyder* v. *Findley, Coxe* 78; *State* v. *Wells, Ib.* 424; 12 *Wend.* 41; 2 *Caines* 90, &c. Engle himself, in his answer to the bill in Chancery, has denied that Thomson was the heir. He has admitted that Leake was seized of this lot, and that he died without heirs. He was present, and sworn as a witness on the first inquisition; he has as administrator charged for surveying this lot; he has as administrator brought trover for wood cut on this lot.

As to the admission of the certificate from New York and of the deposition of Kemble. When the State rested, it was on proof of possession in Leake. The traverser then introduced field book to shew allotment to heirs of Sir Peter Warren, and in connection with it the deposition of Josiah Johnson. In this stage, evidence offered, not to prove title, but as a circumstance from which the jury might infer a conveyance to Leake, and to shew pedigree. Sir P. Warren, who died in 1752, left three daughters, Ann who married Lord Southampton, Charlotte who married Lord Abingdon; and Susannah, who married Gen. Skinner. Susannah died in 1776, leaving a daughter who married Lord Gage, son of General Gage. General Gage married Margaret Kemble, sister of Peter Kemble the father of the witness; the said Peter Kemble and John Watts being the persons named in the letter of attorney from Lord Gage and others, heirs of Sir Peter Warren. We then shew a payment by Leake to Watts for one-third of the lot, and circumstances which in connection with a possession of many years, we urged, create a presumption that he had become the owner of the whole. Payment of consideration in connection with possession for many years, will authorize the presumption of a grant. The entries upon the books are evidence of payment—Kemble being dead, and the transaction in 1795. *Garwood* v. *Dennis,* 4 *Bin.* 314; *Jackson* v. *Miller,* 6 *Wend.* 235; 2 *Cow. Phil. Ev. Notes, pp.* 358, 360, 364, &c.; *Matthewson Presump. Ev.* 194.

The opinion of the court was delivered by

CARPENTER, J. It will not be necessary to review all the ground which has been gone over by the counsel of the respective parties. John G. Leake, whose estate has been a fruitful source of legislation and of litigation in this state, died in the year 1827. It was alleged that he died intestate, and leaving no heirs capable of inheriting his estate. A writ of escheat was thereupon issued and executed, and by an inquisition dated August 24, 1832, and taken before Garret Van Dien, Sheriff of Bergen, it was so found, and that he died seised of certain real estate described in the inquisition. Several acts of the Legislature were from time to time passed in relation to this estate, appointing trustees to take it in charge, &c. In 1836 an act was passed extending the time within which any persons claiming any interest as heirs or next of kin of Leake, might appear and traverse the inquisition ; in regard to several claiming to be heirs, the time allowed by law having expired. No judgment, however, was ever entered upon this inquisition, but different persons claiming to be heirs, on the 15th March, 1837, another act was passed, as expressed in the title, " for the relief of the state of New Jersey in relation to the estate of John G. Leake, deceased." The preamble recited that the state had been subjected to considerable expense in relation to escheat of the lands of Leake, and much of the time of the Legislature for several years past, had been occupied in legislating thereon, therefore, for the purpose of indemnifying the state and preventing the necessity of further legislation in relation thereto, it was enacted as follows : 1. That certain persons named should be special commissioners for the purpose of hearing and determining upon the rights, titles, and claims of all and every person or persons claiming to be the lawful heir or heirs, or next of kin of John G. Leake, deceased, who should present their claims to the commissioners within a time specified in the act. 2. That the commissioners should proceed to investigate, hear, determine, adjudge and decree, as well upon the right, title and claim of the several claimants, as upon the costs and expenses

that ought equitably to be taxed upon the premises.    3. The
act further invested the commissioners with all the powers ne-
cessary for such an investigation in regard to process, &c.; and
declared that the decision and decree of the commissioners
should be final and conclusive on the state of New Jersey, and
such of the claimants as should make themselves parties to the
proceedings.    The act, which is referred to only in a general
way, further provided that on payment of the expenses to
which the state had been subjected, the Attorney General should
release to the claimant declared by the commissioners to be the
heir of the said John Leake, deceased, all the right, title, and
interest of the state to the lands, &c. of which the said Leake
died seized in the county of Bergen, and which, by reason of
there being no heirs in this state at the time, had escheated to
the state.    It was also further enacted that the decree of the
commissioners should be filed in the office of the clerk of the
Supreme Court, and that a writ of *hab. fac. poss.* should issue
out of the said court to deliver the possession of the lands men-
tioned in the inquisition taken by Sheriff Van Dien ; but the
act provided that the proceedings under it should not affect the
right of any other person claiming to be heir, and who might
prosecute his claim against the person to whom the state should
release.

Under the authority given by this statute, the commissioners
adjudged and determined that James Thomson of Glasgow in
North Britain was (then) the lawful heir and next of kin of John
G. Leake, deceased, and entitled to all his estate in the state of
New Jersey ; and on the 23d Feb. 1838, Thomson having paid
the expenses incurred by the state, Attorney General White ex-
ecuted a release to Thomson.    The decree of the commission-
ers duly filed in the office of the clerk of the Supreme Court,
and a writ of *hab. fac. poss.* issued to deliver to Thomson the
possession of the lands mentioned in the inquisition taken by
Sheriff Van Dien, pursuant to the act.

But it seems there was a 17 acre lot not included in the in-
quisition taken before Sheriff Van Dien, of which it was al-
leged that Leake died seised.    Notwithstanding, therefore, the
act of 1837, and the proceedings had under it, an alias writ of

escheat was issued to the Sheriff of the county of Bergen, and a second inquisition taken before Jacob C. Terhune, then Sheriff, the 12th July, 1838. By this inquisition it was found that Leake died seised of this lot, that he died without heirs and without devising the same. On the 22d Nov. 1838, another release was executed to Thomson by the then Attorney General (Mr. Field), of the right of the state in this 17 acre lot mentioned in the second inquisition; this as well as the previous deed of release reciting in general terms the authority under the act of 1837, and the adjudication of the commissioners. John Engle was the tenant and occupant of this 17 acre lot, and he, on the 14th January, 1839, filed in the court of Chancery a traverse to this second inquisition, denying that Leake died seised, or that he died without heirs, alleging that he left James Thomson his heir at law; the issue joined on this traverse was then sent by the Chancellor to the Supreme Court for trial. It might, however, very naturally be supposed, James Thomson by the decree of the commissioners having been declared the heir and entitled to the estate of Leake, and the state having released to Thomson, that all proceedings on the part of the state upon this second, as well as upon the prior inquisition, should here cease. For what purpose should the state carry down the traverse for trial, having admitted James Thomson to be the heir, and released to him any interest which the state might otherwise have had under this inquisition? In point of fact, the state did relinquish all further proceedings under the inquisition, but at the Term of January, 1846, James Thomson, the supposed heir, applied to the Supreme Court for permission to take the issue thus formed down for trial at the Circuit in the name of the State. These facts in the case are referred to, in order that the position of the parties litigant may be understood. James Thomson, who had alleged himself to be the heir of Leake, so adjudged by the commissioners, and Engle the tenant and occupant of the premises in dispute. The Supreme Court sent the issue down for trial, but annexed a condition that such evidence should be admitted on the part of the defendant and of the state respectively, as would be legal and proper on eject-ment, on the demise of Thomson, against the defendant; thus,

treating this proceeding as a controversy between Thomson and Engle in regard to the 17 acre lot. If required to send this traverse down, the propriety of thus changing the issue may be considered as very questionable.

The cause was tried at the Hudson Circuit, and at the trial the traverser offered the act of 1837, the decision of the commissioners, and the releases by the state as evidence to prove that Leake did not die without heirs, but that James Thomson was his heir, and called upon the judge to charge that they were evidence that Thomson was heir according to the law of New Jersey. The judge, however declined so to charge, but charged that the word " *heir*," &c. as used in the statute did not necessarily mean a person capable of inheriting in this state, but was used in a more general sense, as for instance, that it might mean an heir in Scotland capable of inheriting the estate of Leake in that country, if any there. If properly in evidence, this called for the construction of the act, and we think the judge erred in his exposition. It is not supposed that there was any estoppel. If this controversy had been between the State and Thomson, the latter claiming as heir, undoubtedly this act, the decree and proceedings under it, and the releases would have been conclusive evidence against the state. If estoppels technically will not lie against the state, (a) still the state would never be permitted by proceedings under this inquisition to avoid its own grant, obtained in good faith. But the proceeding was not against Thomson, it was Thomson proceeding in the name of the state, and attempting to clothe himself with its rights against Engle.

In regard, then, to the construction of the act. It is a well settled principle, that if a statute makes use of a word the meaning of which is well known, and which has a definite sense at common law, it shall be received in that sense, unless from some reason it clearly appears that it was intended to use the word in a different signification. There is nothing in this statute to shew that the Legislature intended to use the words " heir," and " lawful heir," in any other than the legal sense.

---

(a) 5 *Mass.* 525 ; 3 *Pick.* 224 ; 10 *Mass.* 155 ; 5 *N. Hamp.* 280.

In ascertaining the construction, we may not go to the evidence given on this trial proceeding from Thomson himself, that he was an alien, and a relative of Leake, but in a very remote degree. This testimony in relation to the weakness of his claims, cannot affect the construction of the statute, though it places the legislation and the other proceedings in his favor, in a very remarkable light. An *heir* is the person upon whom the law casts the inheritance, and the word must be so understood in this act, unless there is something that shews it to have been used in some other sense. The acts prior to 1836 are in reference to the preservation and management of the escheated estate by trustees. The acts of 1836 and of 1837, are in reference to the claims of persons alleging themselves to be heirs. The act of 1836 extended the time of traversing the first inquisition in favor of persons alleging themselves to be heirs, and undoubtedly it refers to their claims as the assertion of a legal right—the word being used in this act in a technical sense. Then comes the act of 1837, which created a special commission for settling and determining the rights, titles, and claims of persons claiming to be heirs or next of kin. It neither recites nor alludes to any technical disability, as alienage, illegitimacy, or the like, but refers the claims of title *as heirs* to commissioners. The adjudication of the commissioners follows the authority given by the act; it is, that James Thomson was the lawful heir and next of kin, &c. and entitled to all the estate of the said John G. Leake, deceased, in the state of New Jersey. The language of the act, and of the decree of the commissioners is technical, and imports a legal right. Had it been intended to select, upon some supposed equitable reason, some person related by consanguinity with Leake, but excluded from the inheritance by technical rules of law, it would have been easy so to have constructed the statute as to give effect to such intention. But as in such case he could not take by his own title, to carry out such intention, it would have been necessary to provide some means by which the title of the state in the lands escheated, should be conveyed to, and vested in him ; for no title could pass by dropping the proceedings on the writ of escheat, and merely releasing the rights of the state under such writ. On

the contrary, the act of 1837, simply provides for ascertaining by the decree of commissioners selected for the purpose, who was heir, &c. and the decree in pursuance of the statute adjudges Thomson to be heir and next of kin, and entitled to the estate. The state, then, did not transfer its title; nor does the statute make any provision for that purpose. The state merely removed its hand, transferred to him the possession of so much as had been previously in its custody, released to him its rights, leaving him afterwards to assert and maintain his claims against all others by the force of his own title.

But it has been urged that the verdict should not be set aside on the ground of misdirection, and because the judge erred in the exposition of the statute; for it was said, this evidence is not conclusive, and it was satisfactorily shewn that Thomson was an alien, and at the time of Leake's death incapable of inheriting. If this be so, still we think the verdict should be set aside on the further ground that the rule of January Term, 1846, by which the issue was sent down for trial, was inadvertently and improperly granted. The condition annexed to that rule was obviously the result of the view which the judge or judges who granted it had of the application; that the issue was to be tried in the name of the State, but in truth at the instance and for the benefit of James Thomson. James Thomson and John Engle were the parties litigant, and the subject of dispute was the 17 acre lot in possession of Engle. In regard to the land contained in the first inquisition taken before Van Dien, which had been in the possession of the state, the act made provision to transfer that possession to Thomson, and which he might therefore hold until this advantage should be overcome by some claimant who could produce a better title than himself. But he had no such advantage in regard to the 17 acre lot; he was obliged to produce some actual legal title in order to obtain possession, or to avail himself in some mode of the title of the state. The object of the application being obvious, the court annexed the condition that the admission of testimony on the trial of the traverse should be as if it were an ejectment by Thomson against Engle. This condition was incongruous with the issue to be tried. The claim of Thomson rested upon his

allegation that he was heir. The allegation which on that issue he undertook to affirm was, that Leake died leaving no heir. *Cui bono?* For what purpose should this issue be tried, and why should Thomson be permitted to carry it down for trial? He derived no title from the state. The state had not undertaken to convey to him its title in the lands escheated. The state had simply withdrawn its claims and relinquished its rights if any, under the supposed escheat. Can it be pretended, that because he alleged himself to be heir, and the state admitting the assertion had released to him, that failing to support his claims against third persons by sufficient proof of this assertion, he can now turn round and prosecute his pretended rights in the name of the state? Can he affirm on the trial of this issue that there was no heir, and then when the state has obtained possession, identify himself with its title and use its success for his benefit? By what means, even if the Court were willing to lend its aid for such an effort? The act concerning escheats (*Rev. Stat.* 342) provides in case of issue tried in the Supreme Court, that if judgment be given for the state, then a writ shall be issued out of the Supreme Court to the Sheriff of the county, commanding him to seize and take the lands escheated; and it then further provides a mode for their sale for the benefit of the state. But the state has disclaimed all interest in the premises in dispute under the writ of escheat. The officers of the state are silent, and ask no further action under the record now in this court. If Thomson has rights, they are not rights under this record; he can receive no benefit from any action upon it. If an alien at the time of the death of Leake, the act of 1845 has removed the disability which then existed, and if heir, he may pursue, in the modes prescribed by law, any right to land which would have descended to him, had he been then a natural born citizen of the United States. The record is in this court and under its control; all action that can be had on it must be here. Under all these circumstances, we are of the opinion that the verdict should be set aside; and the rule of January Term, 1846, having been granted improvidently, that this rule should be vacated, and all further proceedings under it stayed.

This result will render any consideration of the other questions argued unnecessary.

NEVIUS, J.   On an alias writ of escheat directed to the Sheriff of the county of Bergen, to inquire whether John G. Leake did not die seized of other lands than those described in a former inquisition, and whether he did not die without heirs, and without devising the same, a return was made dated July 12, 1838, in which it was found that J. G. Leake died seized of a lot of 17 acres, besides the lands described in the former inquisition, and that he died without heirs, and without having devised the same.

John Engle the defendant who was in the occupation of said lot, filed a traverse to this latter inquisition, in Chancery, denying that Leake died seized of this lot, or that he died without heirs, alleging that he left James Thomson his heir at law.   On both branches of this traverse, the state took issue, which was sent to this court for trial.

On the application by James Thomson to this court, to take down this issue for trial at the Circuit in the name of the State, it was by rule directed to be sent to the Hudson Circuit to be tried, and that upon the trial all such evidence be admitted on the part of the defendant as would be legal and proper in an action of ejectment for the said land, brought on a demise of the said Thomson against the said defendant, and on the part of the state evidence to rebut the same."

The cause was tried under this rule before the late Chief Justice, and on the part of the state witnesses testified that John G. Leake had from the year 1795 to the time of his death in 1827, from time to time exercised acts of ownership over this lot.   To overcome this presumptive evidence of seizin, the defendant gave in evidence the original Field book of the partition and allotment of the common lands of the township of Bergen, wherein the lot in question marked in said book as Lot No. 218, was by the commissioners allotted to the heirs or devisees of Sir Peter Warren.   To rebut this evidence, the state offered a certified copy of a paper recorded in the office of the Register of the city of New York, purporting to be a power of attorney dated January 26, 1791, from Henry Lord Gage, and Susannah his wife, and others, to Peter Kemble and John Watts. In connection with this, the state further offered in evidence the deposition of William Kemble, taken in a suit in Chancery.

The object of this evidence was to shew that in the book of original entries of Peter Kemble under date of 1795, there was an account between Francis Gosling and John Wilmot, Trustees to Lord and Lady Gage and Peter Kemble, wherein is a "credit by John Leake for one-third of Lot No. 218 in Bergen county :" other entries in the same book, according to this deposition tended to connect Leake as purchaser of this lot, and the deposition further went to prove that Lady Gage was one of the heirs of Sir Peter Warren. Both these pieces of testimony were objected to on the trial, but were admitted by the court, and that is relied upon as one of the reasons for a new trial in this case.

In the admission of this evidence I think the court erred. The power of attorney was offered to affect the title to lands in New Jersey, and would have been lawful if the original paper had been produced and proved. But a copy of a record from a register's office in New York cannot be legal evidence to establish a title to lands in another state. Suppose it had been an absolute deed for the lands in question, and instead of being recorded in the clerk's office of the county of Bergen, where the lands are, it had been recorded in a register's office in Texas, could a copy of such record be read here in support of title? Such a principle might lead to enormous consequences. This record would not have been evidence in any court in New York for the purpose for which it was offered in this case. The 1st section of the 4th article of the constitution of the U. States, does not reach a case like the present. If this power of attorney or the certified copy of it had been overruled, as in my opinion it ought to have been, it will follow that the deposition of Kemble tending to connect Leake with Lady Gage, as a grantor, under whom he held title, should also have been overruled, for there was then no evidence of a grant from Lady Gage to him directly or indirectly, nor any evidence of his being heir to her.

But as this evidence was offered to prove a seisin in Leake at the time of his death, on a motion for a new trial we may look into the whole of the evidence offered on that point, and if it

appears that the other evidence in the case warrants the verdict, the court will not, for such error in the judge, set it aside. Upon a careful examination of the whole evidence upon the issue of seisin, and considering this as an action of ejectment on the demise of Thomson against Engle, I find no reason, *for this cause*, to disturb the verdict. The open and notorious claim on the part of Leake and his actual possession by enclosure and improvements and his leases for the period of thirty years and upwards, accompanied with the acquiescence of the defendant, and his father before him, as proved on the trial, will abundantly justify a verdict that John G. Leake died seised of the premises in question.

The next issue involved in the case was, whether J. G. Leake died without heirs and without devising said lands, to which the jury by their verdict responded in the affirmative. Upon the trial of this issue the defendant seems to have treated the case no longer in the light of an ejectment on the demise of Thomson, but as a question between the state of New Jersey who claimed the land by virtue of the doctrine of escheat, and the heirs of Leake, and assumed the ground that Leake did not die without heirs, but that he left James Thomson his heir at law. In support of the issue on his part he offered in evidence on the trial, an act of the Legislature of this state, passed on the 15th of March, 1837, entitled "An act for the relief of the State of New Jersey in relation to the estate of John G. Leake, deceased." By this act special commissioners were appointed to "*investigate, adjudicate, hear and determine*, upon the rights and claims of all persons claiming to be the lawful heir or heirs or next of kin of J. G. Leake, who shall present their claims to said commissioners." The 2d section of this act declares "that the decision and decree of said commissioners shall be final and conclusive on the State of New Jersey." This act further provides "that if the commissioners shall determine that any of the said claimants, is or are the heir or heirs of said Leake, the Attorney General shall release all the right and title of the state in and to the lands of which Leake died seized in the county of Bergen, and which by reason of there being no heirs in this state at the time, escheated to the state, to such heir or heirs at law,

or next of kin, on condition that such heir or heirs whom the said commissioners shall determine to be the lawful heir or heirs of the said J. G. Leake, shall pay into the Treasury the costs and expenditures theretofore incurred by the state in regard to said lands." The defendant also produced the report of said commissioners, made by virtue of the foregoing act, wherein it was adjudged and decided that James Thomson was the lawful heir of Leake, and also the assent of James Thomson to the condition upon which the state was to release to him its right in said lands, and also two actual releases by the Attorney General to him, reciting that he was the heir at law. The first dated Feb. 23, 1838, and was for the whole estate of which Leake died seised, and the 2d dated Nov. 22, 1838, and was for the 17 acre lot now in question.

Upon this evidence the counsel for the defendant asked the court to charge or instruct the jury that the decision of the special commissioners, that Thomson was lawful heir, and the recitals and releases were evidence of his being the lawful heir of Leake under the statute of descents of N. Jersey, which the court refused to do, but on the contrary charged the jury that the words *lawful heir* in the act of 1837 did not mean " an heir capable of inheriting under the laws of N. Jersey, but such heir as could inherit the lands of Leake under the laws of any country." This alleged error on the part of the court is assigned as another reason why this verdict should be set aside, and a new trial awarded. To settle this question we are to determine the true meaning of the word heir or lawful heir as used in the statute of 1837.

An heir, says Lord Coke, in the legal understanding of the common law, is he to whom lands descended by the act of God, and right of blood, of some estate of inheritance. The word heir implies all those legal qualifications which the laws require in the persons who represent or stand in the place of another. *Bac. Abr. Title Heir A.* Heir is one who succeeds by descent to lands. *Jac. L. D. Title Heir.* There can be no question as to the true and uniform common law meaning of the word heir, he must be such an one as is capable of inheriting the lands of an ancestor. Was the word used in this its

ordinary and legal sense in the statute referred to ? If a statute make use of a word the meaning of which is well known at the common law, the word shall be understood in the same sense it was understood at the common law. 6 *Mod* 143. The words lawful heir then must be understood to mean an heir capable of inheriting the lands in question under the laws of N. Jersey, unless from the whole scope of the act, it is clearly manifest that it was not used in that sense by the Legislature. Upon a careful examination of the act I cannot perceive that these words were used in a sense different from their common law meaning. The act invests these special commissioners with power to investigate and determine the claims of persons claiming to be the lawful heirs, or next of kin of J. G. Leake, and if they find and determine that any such claimant is heir, then the Attorney General shall release the right of the state to such heir or next of kin, &c. Here are two classes of claimants whose pretensions were to be examined and decided by the commissioners, those who claimed to be legal heirs, and those who only claimed to be next of kin. If a lawful heir was found, the release was to be made to him, *or to the next of kin*, on condition that such *heir* should indemnify, &c. This act is not drawn with great precision, yet I apprehend its true construction is, that for want of a lawful heir, if the next of kin was found, the release should be made to him or them, on his or their indemnifying the state, &c. That the Legislature contemplated the discovery of a lawful heir capable of inheriting these lands, may too be inferred from their directing a release to be made. A release is a secondary or derivative sort of conveyance, and defined to be a conveyance of one's right in lands to another who has some former estate in possession. If then there was no heir capable of inheriting this land, there would be no estate for the release to operate upon. In the 3d section of this act the word heirs is most clearly used in its common law and ordinary sense. The language is : " These lands escheated to the state by reason of there being no heirs in this state at the time." Surely the word heirs here means, such heirs as were capable of inheriting the lands, and not such heirs as might have taken an inheritance from Leake in Scotland or any other country. I

can see nothing in this act which will warrant the construction put upon the words *lawful heirs*, by the judge who tried this issue. I think that the report of the commissioners and the release by the state to James Thomson, who was adjudged to be the lawful heir, is final and conclusive on the State of New Jersey, as it is declared to be by the act itself.

For this reason I am of opinion that the verdict ought to be set aside, and a new trial granted.

Verdict set aside, and rule directing issue out of Chancery to be taken down for trial by James Thomson, vacated.